MALLORY

v.

OHIO UNIVERSITY.

 2002-Ohio-7406.]

Court of Claims of Ohio.

No. 99–04593.

Decided Dec. 17, 2002.

Jan L. Roller, for plaintiff.

Betty D. Montgomery, Attorney General, and Randall W. Knutti, Assistant Attorney General, for defendant.

FRED J. SHOEMAKER, Judge.

{¶ 1} This case was tried to the court on the issue of damages on plaintiff's claim for defamation. In a prior decision on the issue of liability the court found in favor of defendant. However, the Tenth District Court of Appeals reversed this court's decision, finding that a statement by defendant's employee, Jeanine Woodruff, constituted slander per se. (Dec. 20, 2001), Franklin App. No. 01AP–278, 2001 WL 1631329.

{¶ 2} In 1996, plaintiff enrolled as a student at Ohio University ("OU"). On November 19, 1997, during plaintiff's sophomore year, plaintiff and another student, Audrey Delong, were at a local bar; both students were drinking alcohol that evening in celebration of Delong's 21st birthday. According to plaintiff, both he and Delong were intoxicated when they left the bar and walked to Delong's sorority house. Shortly after arriving at the sorority house, Delong engaged in a brief argument with her "housemother" concerning the house policy forbidding male guests at night.

{¶ 3} Plaintiff and Delong then left the sorority house and walked across the campus to plaintiff's dormitory room, where they began engaging in sexual conduct. Delong vomited during this time, and she and plaintiff both went to the dormitory showers to clean up. While in the showers, plaintiff and Delong engaged in further sexual conduct; during this time, other dormitory residents observed the two in the shower area, and a resident advisor asked plaintiff and Delong to leave. Delong was still visibly intoxicated as she left the shower area.

{¶ 4} The next morning, campus police questioned Delong regarding the events, and she was also counseled by Woodruff, the assistant director of the OU Department of Health, Education, and Wellness ("HEW"). According to Delong, she could not remember any of the events of the previous evening.

{¶ 5} Plaintiff was subsequently charged with sexual assault under the university's code of student conduct and appeared at a "Judiciaries Hearing." As a result of the hearing, plaintiff was found "responsible" on the sexual assault charge and expelled from the university.

{¶ 6} Plaintiff was also indicted by an Athens County Grand Jury for the crime of sexual battery. The case came before a jury in October 1998, and the trial ended in a hung jury, with 11 jurors voting for acquittal and one juror voting for conviction. The prosecutor for Athens County elected not to retry plaintiff, and all of the charges against him were dismissed with prejudice.

{¶ 7} Plaintiff's criminal trial was the subject of extensive coverage by local Athens newspapers. In addition to reporting the facts of the case, the newspapers also published editorials, press releases, and letters expressing various viewpoints about the case. Among the publications was a letter written by plaintiff's parents characterizing the actions taken by OU in plaintiff's case as "appalling." The letter specifically criticized HEW for providing Delong counseling and support while denying such assistance to plaintiff. Jim Phillips, an associate editor for The Athens News, contacted Woodruff and asked her to respond to the letter. Woodruff orally answered some of Phillips's questions, and subsequently provided a written statement in response to the parents' letter.

{¶ 8} On November 12, 1998, The Athens News published an article entitled "After sexual battery charges are dismissed Mallory's parents lash out at OU, media." Included in the article were statements by plaintiff's parents, plaintiff's defense attorney, prosecuting attorneys, a member of a feminist student group, and OU employees, including Woodruff. The section of the article containing Woodruff's statements included the following paragraph:

{¶ 9} " 'The information generated by the [university] police definitely met the definition of sexual battery, and certainly was a violation of the student code of conduct,' Woodruff said. 'It's not like some people want to make out, that this

was two drunk people having a good time, and one of them felt bad about it the next day. For them to say [Mallory] was treated unfairly just seems kind of ridiculous, from my perspective. He definitely committed a sexual battery, from the information that was gathered.'"

{¶ 10} On February 24, 1999, plaintiff filed a complaint in this court alleging in part that Woodruff had uttered defamatory statements against plaintiff. Following the liability phase of the trial, the court found in favor of OU, concluding that the ordinary reader would view Woodruff's statements as opinion and not fact. On appeal, the Tenth District Court of Appeals reversed, finding that Woodruff's statement "implied that her assertion had a factual basis, and the average reader or listener could have concluded that Woodruff was in a position to have been privy to the information gathered by the university police, thereby viewing her statement as fact rather than opinion." *Mallory v. Ohio Univ.* (Dec. 20, 2001), Franklin App. No. 01AP–278, 2001 WL 1631329. The court held that "the statement involves a direct accusation of criminal activity involving moral turpitude on the part of the plaintiff, and we therefore conclude, as a matter of law, that the statement constituted slander *per se.*"

{¶ 11} During the damages trial, plaintiff's witnesses included his parents, Ruth and Chuck Mallory, and Dr. Richard Freeland, a psychiatrist who had treated plaintiff for anxiety and depression. Ruth Mallory's testimony is summarized as follows. As a child, plaintiff excelled in school despite having a mild attention deficit disorder. Plaintiff graduated from high school in 1996 and began classes at OU in September of that year. In 1997, plaintiff suffered a panic attack at school, during which he complained that he was having trouble breathing. Some roommates took him to a local hospital, where he was eventually able to calm down. While plaintiff had suffered anxiety before, this was the first time he experienced a panic attack.

{¶ 12} After plaintiff was expelled from OU in the spring of 1998, he lived at home with his parents in Canal Winchester and began attending classes at Ohio State University ("OSU") during the fall of 1998. Plaintiff's criminal trial commenced in October 1998 and, as noted above, resulted in a hung jury. On November 9, 1998, the prosecutor announced that the charge against plaintiff would be dropped. According to Ruth Mallory, her son was elated at the news, but when the Athens newspaper article containing Woodruff's statements was released on November 12, 1998, plaintiff "was devastated" and an "emotional wreck."

{¶ 13} At trial, plaintiff introduced a Columbus Dispatch article, dated May 3, 2002, reporting that the Supreme Court of Ohio had "ruled 4–3 without comment, upholding a lower-court ruling that said former Ohio University student Benjamin Mallory was slandered by an administrator's comment to a newspaper that

university officials thought Mallory committed sexual assault." The article stated, "The Supreme Court's decision means Mallory can return to the Ohio Court of Claims in Columbus to seek financial damages from the university." The article also provided background information on plaintiff's criminal trial, and stated, "After the trial ended, the assistant director of the university's Department of Health, Education, and Wellness said in a newspaper article that despite the outcome of the trial, she and other university officials thought that Mallory did commit sexual assault." Plaintiff's mother testified that she was aware that some individuals she knew in the community had read the article.

{¶ 14} Plaintiff testified on his own behalf. He stated that he is currently on a leave of absence from graduate studies in biomedical sciences at Mount Sinai School of Medicine. Plaintiff has been hospitalized a total of eight times since the events in Athens, including recent hospital visits this year. More specifically, in January and February 2002, plaintiff was hospitalized at Bellevue Hospital Center in New York for anxiety and depression. He was diagnosed by physicians at that hospital as suffering from bipolar disorder, with "intermittent psychotic features," and "possibly generalized anxiety disorder." In August 2002, he was hospitalized at Mount Sinai Medical Center and also at Lennox Hill Hospital in New York.

{¶ 15} Plaintiff described the events surrounding his trial in Athens County as "horrific," but he stated that he had believed he would be vindicated by the justice system. Plaintiff testified that when he read Woodruff's comments in the article, he was in disbelief and shock. He stated that Woodruff's comments "reopened a wound," destroyed his reputation in the eyes of others, and took away all vindication he felt he had received as a result of the trial. Plaintiff related three instances in which he believed he lost employment because of the incident involving Delong.

{¶ 16} He stated that he was unable to take a full-time class schedule at OSU because of his depression and anxiety. Plaintiff presented evidence that he has incurred $82,246.03 in medical bills, excluding amounts covered by insurance. Plaintiff also testified that it took him an extra year to complete college because of having to drop various classes due to his depression and anxiety. Plaintiff introduced evidence that he took out bank loans in the amount of $14,898.35 for his education expenses, and he testified that he owed his parents an additional $2,500 for school expenses. Based upon the amounts cited above, plaintiff claimed that he had total out-of-pocket losses of $99,644.38.

{¶ 17} Dr. Richard Freeland, who is a professor of clinical psychiatry at OSU, began treating plaintiff in January 2001 on an outpatient basis. Dr. Freeland diagnosed plaintiff as suffering from generalized anxiety disorder and depression. Dr. Freeland noted that as early as 1995 and 1996, plaintiff experienced some

emotional problems and suffered symptoms of generalized anxiety on several occasions. Plaintiff exhibited psychological symptoms earlier in adolescence; specifically, he had a distorted perception regarding his abdomen, diagnosed as "body dysmorphic disorder."

{¶ 18} The first time plaintiff met with Dr. Freeland, he told the doctor about the incident in Athens. He also mentioned newspaper articles, including the one that contained Woodruff's comments. In addition, plaintiff told Dr. Freeland that he believed the vindication he felt after the trial had been taken away from him by comments made by university officials.

{¶ 19} Over a period of time under Dr. Freeland's care, plaintiff's condition improved, and he was able to obtain a part-time job, to graduate from OSU, and then begin graduate school in New York. In February 2002, plaintiff had a serious recurrence of anxiety and depression.

{¶ 20} Dr. Freeland described plaintiff as very sensitive and noted that plaintiff was very concerned about how he was perceived after the events in Athens. Dr. Freeland opined that plaintiff experienced definite emotional injury as a result of Woodruff's comments. Plaintiff viewed the comments as a direct attack on his character. Dr. Freeland stated that the comments were a substantial factor in exacerbating or increasing plaintiff's symptomology.

{¶ 21} Regarding plaintiff's prognosis, Dr. Freeland stated that if plaintiff is consistent with his treatment, he can do much better than he has over the past years. However, plaintiff has a chronic condition, and he will continue to experience psychological symptoms. Dr. Freeland stated that he believed that plaintiff could be successful in completing graduate school and pursuing a career.

{¶ 22} On cross-examination, Dr. Freeland noted that in December 1998, Dr. John Malinky was the first physician to treat plaintiff for anxiety or depression following the events in Athens during the fall of 1998. Dr. Freeland also revealed that he had reviewed plaintiff's extensive medical records, including notes taken by Dr. Malinky shortly after the incident, and he acknowledged that plaintiff had made no reference to Woodruff's comments until 2001, when he began plaintiff's treatment. Dr. Freeland also stated that he was aware that plaintiff has been involved in three separate litigation events since 1998: plaintiff's criminal trial in Athens, the suit filed by plaintiff in the instant case, and a federal sex-discrimination suit filed by plaintiff.

{¶ 23} Dr. Freeland agreed that a number of factors, in addition to the comment by Woodruff, exacerbated plaintiff's preexisting psychological problems. Those other factors contributing to plaintiff's stress included the following: (1) accusations against plaintiff of sexual assault in the university expulsion proceedings, (2) his arrest on sexual battery charges, (3) his criminal indictment, (4) his

expulsion from school, (5) the notoriety he received in the Athens area, (6) the events surrounding his criminal trial, (7) comments made about him in articles other than the Athens News article at issue in this case, (8) other comments made in The Athens News, and (9) plaintiff's participation in two separate civil suits. Dr. Freeland acknowledged that, although all of the above factors exacerbated plaintiff's preexisting condition, he had no ability to assign any percentage of harm to any of these stressors, including the Woodruff comment.

{¶ 24} Plaintiff asserts that his total out-of-pocket expenses, including medical treatment ($82,246.03) and education expenses ($17,398.35) are $99,644.38. Plaintiff requests this court to award him the portion of his medical expenses that are attributable to the injury he sustained as a result of Woodruff's comments plus additional damages for mental and physical pain and suffering.

{¶ 25} At the outset, the court will address defendant's argument that plaintiffs who prevail in defamation suits are entitled only to nominal damages unless they prove special damages. Defendant maintains that plaintiff failed to prove special damages, based upon defendant's assertion that plaintiff offered no proof that anyone treated him differently because of Woodruff's comments.

{¶ 26} However, as noted above, the Tenth District Court of Appeals previously held that the statement by Woodruff constituted slander per se, as it imputed criminal conduct. Thus, injury is presumed, and, as noted in the case relied upon by defendant, " 'the existence of some damage will be presumed and thus plaintiff is not required to plead and prove special damages.' " *Strussion v. Akron Beacon Journal Publishing Co.* (2002), Summit App. No. 20833, 2002-Ohio-3200, 2002 WL 1371166, quoting *Jones v. White* (Oct. 15, 1997), 9th Dist.App. No. 18109, 1997 WL 669737. Accordingly, plaintiff is entitled to more than nominal damages in this case.

{¶ 27} Regarding the type of damages recoverable in a defamation action, the law generally holds that a plaintiff may recover "economic losses, which include lost income and loss of earning capacity, where the evidence shows a nexus between the damages and the defamation," and damages "also include impairment of reputation, personal humiliation, shame, mental anguish, and suffering." *Isquick v. Dale Adams Enterprises, Inc.* (2002), Summit App. No. 20839, 2002-Ohio-3988, at ¶ 37, 2002 WL 1800378. Furthermore, "a plaintiff is not required to 'provide the [trier of fact] with some precise formula by which [it] could calculate a damage award.' " Id., quoting *Stokes v. Meimaris* (1996), 111 Ohio App.3d 176, 186, 675 N.E.2d 1289.

{¶ 28} As noted by plaintiff, because this case involves an action against a state university or college, R.C. 3345.40 sets forth certain criteria regarding the recovery of damages. More specifically, R.C. 3345.40(A) states:

{¶ 29} "(2)(a) 'The actual loss of the person who is awarded the damages' includes all of the following:

{¶ 30} "(i) All wages, salaries, or other compensation lost by an injured person as a result of the injury * * *;

{¶ 31} "(ii) All expenditures of an injured person * * * for medical care or treatment * * * that were necessary because of the injury;

{¶ 32} "(iii) All expenditures to be incurred in the future * * * for medical care or treatment * * * that will become necessary because of the injury;

{¶ 33} "* * *

{¶ 34} "(vi) Any other expenditures of an injured person * * * that the court determines represent an actual loss experienced because of the personal * * * injury * * *."

{¶ 35} R.C. 3345.40(B) states:

{¶ 36} "(B) Notwithstanding any other provision of the Revised Code or rules of a court to the contrary, in an action against a state university or college to recover damages for injury * * * to persons * * * caused by an act or omission of the state university or college itself, by an act or omission of any * * * officer, or employee of the state university or college while acting within the scope of his employment or official responsibilities, * * * the following rules shall apply:

{¶ 37} "(1) Punitive or exemplary damages shall not be awarded;

{¶ 38} "(2) If a plaintiff receives or is entitled to receive benefits for injuries or loss allegedly incurred from a policy or policies of insurance or any other source, the benefits shall be disclosed to the court, and the amount of the benefits shall be deducted from any award against the state university or college recovered by the plaintiff. * * *

{¶ 39} "(3) There shall not be any limitation on compensatory damages that represent the actual loss of the person who is awarded the damages. However, * * * damages that arise from the same cause of action, transaction or occurrence, or series of transactions or occurrences and that do not represent the actual loss of the person who is awarded the damages shall not exceed two hundred fifty thousand dollars in favor of any one person."

{¶ 40} Plaintiff's expert, Dr. Freeland, testified that the comment by Woodruff was a substantial factor in exacerbating or aggravating plaintiff's preexisting anxiety condition. Dr. Freeland was the only medical expert to testify at trial. However, defendant has offered evidence to show that not all of plaintiff's injuries are attributable to this one comment by defendant's employee; rather, defendant has presented evidence that the comment by Woodruff was one of many stressors that affected plaintiff as a result of the events in Athens. As acknowledged by

Dr. Freeland, in addition to Woodruff's comment, plaintiff's condition was exacerbated by concerns related to accusations by other persons, his criminal indictment, his trial, other litigation, other newspaper articles, and so forth. Indeed, plaintiff concedes that not all of his injuries are related to the comment made by Woodruff. Thus, the difficult issue before this court is to determine what damages are attributable to the comment by defendant's employee, a matter further complicated by the fact that the injury involves aggravation of a preexisting condition.

{¶ 41} Courts have recognized that "a defendant whose acts aggravate a plaintiff's preexisting condition is liable only for the amount of harm actually caused by the negligence." *LaMoureaux v. Totem Ocean Trailer Express, Inc.* (1981), 632 P.2d 539, 544, citing 2 Harper & James, The Law of Torts (1956), Section 20.3, at 1128; W. Prosser, Law of Torts (4th Ed.1972), Section 52, at 318.

{¶ 42} In considering the extent to which plaintiff's condition was aggravated by Woodruff's statement, the court notes that plaintiff's primary contention is that the comment by Woodruff undermined the vindication he felt following the jury verdict. The court is struck, however, by the paucity of evidence in the record to support plaintiff's testimony on this issue. Plaintiff's own witness, Dr. Freeland, acknowledged that a review of plaintiff's medical records from late 1998 until 2001 reveals that over that period of time plaintiff never specifically mentioned the comment by Woodruff to any treating physician. Rather, it was only when plaintiff began treatment with Dr. Freeland in January 2001, that plaintiff first mentioned the comment by Woodruff.

{¶ 43} Part of the evidence in this case includes a report by Dr. John Malinky, dated December 9, 1998, containing the physician's initial assessment of plaintiff. That report includes the earliest recorded notes taken by a physician of plaintiff's own thoughts shortly after the events in Athens:

{¶ 44} "Ben reported, 'I'm going through the worst situation. I'm a former student at O.U. I left in November of 1997. I'd gone out drinking and I walked to her place and we went back to my place. We'd been drunk and we had sex. A cop then came to my door and accused me of sexual battery. She was drinking and couldn't consent to sexual intercourse. The woman denied that she was forced and she didn't want to pursue this, but it was something political. I had to go to court and the jury found in my favor 11 to 1. Now I've filed a suit in federal court for gender discrimination. She initiated the sex act. The university filed a complaint against me. The police weren't contacted until four or five hours after the incident. The girl did not press charges. The university pushed this thing. She didn't want to pursue it. She said, though, that she couldn't remember what happened from 11:30 p.m. to 6:00 in the morning. Now I'm working at OSU in the medical research facility. I'm pre-med. They found out about the incident

from a girl who graduated from O.U. There were a few letters to the editor in the paper. Then on November 24th of this year, they let me go. My boss said he needed someone full-time, someone older and more experienced. There was just a dramatic change how people responded to me. I enjoyed working as a research assistant. That night, my boss told me he could find me another job. * * * When I was in high school, I was diagnosed with ADD. I did well in school, though, but I have some impulsiveness. They threw me out of school at O.U. in April, even before the trial. I've just been under a lot of stress."

{¶ 45} As indicated, neither this report nor any other medical records over more than a two-year period following the events in Athens contain any reference by plaintiff to Woodruff's remarks. While this court finds, based upon the medical evidence, that Woodruff's comment was a cause in fact of some injury to plaintiff, the court is not required to find, nor would the evidence support a finding, that the single comment at issue was the sole (or even primary) cause of plaintiff's injuries. In the context of a highly publicized criminal trial, the court views with some caution the reliability of plaintiff's testimony concerning the extent to which he believes this single comment took away all vindication he felt following the criminal trial. A review of some of the articles deemed by Dr. Freeland as also contributing to plaintiff's stress, including statements of prosecutors involved in plaintiff's criminal trial, reveals that others made comments similar to the one plaintiff characterized as undermining his feelings of vindication by the hung jury. Further, although the comment by Woodruff exacerbated plaintiff's diagnosed symptoms, plaintiff's medical expert readily acknowledged that he could not assign a percentage as to the harm plaintiff suffered from that single comment, nor could he determine to what degree the various other stressors affected plaintiff.

{¶ 46} Upon review of the totality of the evidence, and after evaluating the credibility of all the witnesses, including the expert witness, the court finds that the comment of defendant's employee was a secondary stress event in comparison to a number of other more significant stress events affecting plaintiff. Plaintiff's medical records are replete with references by plaintiff to factors unrelated to the Woodruff comment, including a focus on his expulsion from OU, pending lawsuits, and the events of November 19, 1997, involving Delong. In one medical report from 1999, under the heading "precipitating stressors," plaintiff's reported concerns focused upon his expulsion from school, his criminal trial in 1998, and a pending lawsuit filed in 1998. Another progress note disclosed that plaintiff discussed the events surrounding his expulsion from school, during which he reported that he drank five beers and two mixed drinks on the night of the incident and stated that if he had been sober he "would not have done this sexual thing." Plaintiff was adamant, however, that he believed the charges were

"totally trumped up" and that "the girl was totally willing." In a progress note from December 2000, plaintiff reported that the "main precipitator is the stress of legal issues while a student at OU." Thus, in considering the issue of the measure of damages attributable to defendant's conduct, the court concludes that the greater weight of the evidence does not support a finding that the comment by defendant's employee was as significant as other stressors affecting plaintiff's pre-existing condition.

{¶ 47} Based upon the evidence presented, the court concludes that plaintiff is entitled to recover total damages attributable to the comment of defendant's employee in the amount of $25,000, which represents his actual loss and pain and suffering. Accordingly, judgment shall be rendered in that amount plus the filing fee paid by plaintiff.

Judgment for plaintiff.

FRED J. SHOEMAKER, J., retired, of the Franklin County Court of Common Pleas, sitting by assignment.